Filed 12/10/25  In re David P. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DAVID P., a Person Coming Under the Juvenile Court Law. | B344203 |
| | (Los Angeles County Super. Ct. No. 23CCJP00257A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Respondent, | |
| v. | |
| F.P. et al., | |
| Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Anuradha Khemka, under appointment by the Court of Appeal, for Appellant Minor.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

————————————

**INTRODUCTION**

Mother F.P., father G.M., and minor David M. appeal from the juvenile court's order terminating parental rights without a bonding study to help the court determine whether the parental-benefit exception applied.[1] We conclude appellants have not met their burden of demonstrating the juvenile court's decision was arbitrary, capricious, or patently absurd; in other words, that the court abused its discretion. Accordingly, we affirm.

---

[1] G.M. and David joined F.P.'s argument on appeal that F.P.'s parental rights should not have been terminated without a bonding study. G.M. and David do not raise any other issues. (See Cal. Rules of Court, rules 8.200(a)(5) ["Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal."]; 5.725(a)(1) ["[t]he court may not terminate the rights of only one parent under section 366.26."].) As a result, we focus on the facts underlying the proceedings related to F.P.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *Dependency Proceedings*

F.P. and G.M. are the parents of David, born in 2022.  On January 23, 2023, when David was five months old, the Los Angeles County Department of Children and Family Services (Department) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[2]  The petition alleged the parents have a history of engaging in violent altercations in David's presence.  On November 25, 2022, G.M. hit F.P., pressed a gun to her body, and sexually assaulted her while David was present.  In August and September of 2022, G.M. hit F.P., causing bruising and other injuries.  G.M. also hit F.P. on multiple other occasions while she was pregnant with David.  The petition further alleged G.M. has a history of substance abuse and is a current abuser of methamphetamine and marijuana.  The petition alleged F.P. failed to protect David from the domestic violence between G.M. and F.P.  David was detained from his parents' custody and placed with a foster family.  F.P. received monitored visits four times a week for a minimum of two hours and the Department was given discretion to liberalize visits.

F.P. admitted to the Department's investigator that "[a]ll of this is true" and recounted the numerous episodes of domestic violence that occurred between her and G.M. during their relationship.  She also confirmed she knew G.M. smoked crystal methamphetamine and marijuana.

---

[2]     All section references are to the Welfare and Institutions Code unless otherwise specified.

On March 10, 2023, the juvenile court sustained the petition as alleged against G.M. and F.P.  The court declared David a dependent of the court pursuant to subdivisions (a) and (b) of section 300 and removed him from the parents' custody.  The court further ordered reunification services for both parents and continued monitored visitation for F.P.

During the 18-month reunification period, F.P. consistently visited David, as described below.  F.P. initially complied substantially with her court-ordered case plan, attending 31 domestic violence support group sessions (five more than required), completing 42 individual therapy sessions, and testing negative for all substances in January 2024.

Throughout the dependency proceedings, F.P. concealed her ongoing relationship with G.M., who sometimes sat just outside of the video frame during her telehealth counseling sessions.  F.P.'s individual therapy sessions were terminated in June 2024 after three consecutive absences.  F.P. understood David was harmed by the domestic violence between her and G.M. and obtained a six-month restraining order against G.M.  Her therapist, however, concluded F.P.'s "knowledge indicates she intellectually understands domestic violence: however, her complex trauma rooted on adverse childhood experiences impairs client to develop healthy relationships.  During the process of supporting [F.P.] to process and heal complex trauma, the client disclosed cognitive distortions about self and developing distorted concepts about love and emotional connections.  Emotionally and psychologically, the client could not apply and process genuinely the relationship with the father due to her cumulative trauma."

4

F.P. and G.M. both admitted they continued their relationship throughout the dependency proceedings. F.P. relayed to the social worker that G.M. stabbed her in the thigh with scissors in February 2024. She also admitted he comes to her home "whenever he wants." At various times, F.P. provided the social worker with a number of videos and photographs of her with G.M. in intimate settings with time stamps indicating they were together during the reunification period. G.M. accused F.P. of defaming him to his friends and family and arriving unannounced at his places of employment.

The Department never liberalized F.P.'s visitation due to her continued contact with G.M. The court found a substantial risk of detriment to David if he was returned to F.P. at the six-month, 12-month, and 18-month review hearings for this reason.

Aside from the initial detention, David resided with the same caregivers throughout the proceedings. The Department social workers regularly reported that David was well-cared for and happy at the caregivers' home. The caregivers ensured he received proper medical and therapeutic services. When he began to speak, he referred to both caregivers as "ma." F.P. affirmed her desire to reunify with David but stated that she would like his caregivers to adopt David if she was unable to do so. The caregivers expressed their desire to adopt David.

B. *F.P.'s Visits with David*

As stated, the juvenile court ordered the Department to provide F.P. with monitored visits at least three times a week. F.P. regularly visited with David and engaged well with him throughout the dependency proceedings. In the jurisdiction report, the Department did not report any missed or late visits.

In the six-month status review report, the Department's social worker observed F.P. engaged "fairly well" with one-year-old David, and was prepared for visits by bringing suitable activities, food, and a change of clothes and diapers for him. The Department reported, "It was observed that the child has a bond with their mother by evidence of the child going into the arms of the mother upon arriving to the monitored family time."

In the 12-month status review report, the Department noted the visits with F.P. continued to go well but she visited David four times and cancelled four times between September 2023 and November 2023. The caregivers cancelled twice during this time period.

On April 8, 2024, one of the caregivers monitored a visit between F.P. and David. She reported F.P.'s statements were incoherent and her lips were white. The caregiver believed F.P. was "under the influence." F.P. claimed she was not feeling well due to her medication. In a May 8, 2024 last minute information filing, the Department reported the social worker "has observed during the monitored visits, the child regresses developmentally such as disengaged, limited to no verbal communication and instead using gestures to communicate, lack eye contact, is crying, hiding, but not limited to having a flat affect. Further, per the caregivers, the child returns to the placement confused and has a difficult time stabilizing emotionally."

From May to August 2024, just before the 18-month review hearing, F.P. visited with David nine times, but cancelled more than 15 scheduled visits. When she visited, she was prepared and engaged well with David, including during a three-hour visit for his birthday. The social worker observed David had "limited verbal contact with the mother" but "was receptive to engage

6

with the mother" by making eye contact or holding F.P.'s hand. During four visits in August, September, and October 2024, the social worker observed David engaged with F.P. by holding out his arms to be picked up, reciprocating hugs, and holding F.P.'s hand. She played with him, changed his diaper, and fed him during the visits.

During two six-hour-long visits with David in November 2024, F.P. displayed the same attentiveness and care as the other visits. F.P. continued to have weekly visits with David in December 2024 and January 2025. Although several visits were cancelled due to the fires in Los Angeles, F.P. had four visits with David in January 2025, just before the court terminated F.P.'s parental rights. The Department's human services aide reported, "During the visits, the mother is nurturing, she plays with the child, provides basic standards while the child is in her care. The child is comfortable with the mother, he is receptive and playful. The mother is good with the child, she plays with him. The child does not verbalize with the mother, he is just playing with the mother, the child is not physically engaging with the mother, as soon as the child arrives to the visits, the child is eating and playing, he is not in any stress with the mother, and there is no physical attachment."

C.    *Section 366.26 Proceedings*

At the 18-month review hearing on August 22, 2024, the trial court terminated reunification services for F.P. and G.M. Although the court commended F.P.'s "ability to have good visits with David because it does appear that mother comes prepared and has good visits," the court stated it believed the parents' compliance with the case plan, "though technical, is not

7

substantive. And so the parents' compliance is partial." The court set a hearing to select and implement a permanent plan pursuant to section 366.26 for December 19, 2024.

In its subsequent section 366.26 report, the Department noted F.P. initially visited David weekly but her visits recently became "inconsistent and sporadic." Notwithstanding her continued attentiveness and care for David during their visits, the Department's social workers concluded that F.P.'s cancelled and no-show visits disrupted David's emotional regulation and F.P.'s focus appeared to be on her needs rather than those of David.

The Department conducted an analysis pursuant to *In re Caden C.* to evaluate F.P.'s relationship with David.[3] It concluded, "The harm of severing the relationship with the mother does not outweigh the security, finality, and sense of belonging that adoption would provide." "During monitored visits, the child is receptive to the mother's affection and attention and expresses a generally positive affect. However, despite these interactions, the child does not appear to have a significant emotional attachment to the mother. While the child may respond positively in the moment, there is no evidence of a deep or lasting bond that would indicate a strong, positive emotional attachment. This suggests that, while the child may recognize the mother and respond to her affection, the attachment is not as deep or secure as would be expected for a primary caregiver."

---

[3]     *In re Caden C.* (2021) 11 Cal.5th 614, 630.

At the December 19, 2024 hearing, F.P.'s counsel requested a bonding study, citing to David's young age and the demonstrated relationship between David and F.P. David's counsel did not oppose the request and G.M.'s counsel took no position because G.M. was unavailable that day.

The court stated it did not believe a bonding study would be beneficial in this case. It noted a parent is not entitled to a bonding study. The court stated it could see "David is on the mother's lap. He seems happy. Mother is kissing him. . . . I mean, what else is a bonding expert going to tell me." The court stated the bonding expert would need to spend much more than just one session observing F.P.'s and David's interactions and that delay to permanence would not be in David's best interest at that juncture. The court further stated a bonding study should have been requested earlier in the case. The court set a further permanency hearing pursuant to section 366.26 for January 31, 2025, to allow the Department to conduct a *Caden C.* analysis as to G.M. and to evaluate potential additional relatives for placement.

After a short break in the proceedings for the juvenile court to further consider the parties' request for a bonding study, the juvenile court denied the request, explaining it came "too late" in the proceedings. The court reasoned, "[t]he court does not believe that an expert observer or a psychologist who is observing one, or even a few visits, would be able to provide the court with sufficient information to change the court's perception of the evidence, or even add to the evidence for the court to make an analysis. And the court recognizes that the court can only consider the mother's visitation in light of the visits that were offered to the mother. But, again, being that the child is

9

nonverbal, I don't believe that a bonding study would facilitate the court in making any additional evidence clearer to the court in making the .26 decisions." F.P. filed a notice of appeal from the December 19, 2024 order.

At the subsequent section 366.26 hearings on January 31 and February 13, 2025, David's counsel moved for a continuance and renewed a request for a bonding study. The court denied the continuance and the request. The court stated the parties had an opportunity to request a bonding study earlier in the proceedings but did not. The court additionally noted the amount of information it had due to the more than 18 months of monitored visitation. The juvenile court then heard testimony from G.M., F.P., the Department social worker, and F.P.'s investigator, each of whom testified regarding the quality and quantity of the parents' visits with David.

F.P. testified that she frequently visited David, who is "always pointing at me. And he's always happy. And he always calls me mom, and hugs me." She explained David did not want to go home from visits at the beginning but F.P. worked to transition him, letting him know it was time to go home and to stop playing. She also tried to teach David numbers and words during their visits.

F.P.'s investigator testified she observed a January 22, 2025 three-hour visit between F.P. and David. The investigator reported F.P.'s visit went "really well" because F.P. was on time, came prepared, was attentive to David's needs, actively engaged with him, and used the full three hours allotted to her. The investigator agreed the visit she observed was similar to the visits that were described in the Department's reports. The social worker testified she had an obligation to remain neutral

and provide factual observations in the reports. On cross-examination, F.P.'s counsel and David's counsel questioned the social worker regarding certain discrepancies found in the reports.

After testimony was concluded, the Department requested the court terminate parental rights. The Department argued F.P. lacked the requisite relationship with David because he did not appear to experience separation anxiety when he was not with F.P. This was shown by the ease with which David left visits and his indifference when a visit did not occur. According to the Department, this was evidence that David lacked a substantial connection with F.P. The Department further highlighted F.P.'s lack of credibility due to her hiding her relationship with G.M. throughout the proceedings. The Department then observed F.P. had previously accused the maternal grandmother of physically and sexually abusing her, yet asked that David be placed with the maternal grandmother so that F.P. would have better access to David. According to the Department, this demonstrated that F.P. was focused on her needs rather than those of David.

David's and F.P.'s counsel argued the beneficial parent-child relationship exception applied to preclude adoption. (See § 366.26, subd. (c)(1)(B)(1).) Both counsel argued the information in the Department's reports was biased and incomplete, necessitating information from a neutral third party.[4]

_____

[4] On January 31, 2025, F.P. moved to relieve the social worker assigned to the case. (See § 16513.5 [authorizing court to remove social worker "if a preponderance of evidence shows that a conflict of interest has occurred that would interfere with the

11

The juvenile court terminated the parental rights of F.P. and G.M. and ordered adoption as David's permanent plan. The juvenile court found F.P. regularly visited David but had not established a sufficient bond with him to warrant applying the beneficial parental-benefit exception. According to the court, F.P. did not show that terminating the relationship would be detrimental to David as weighed against the benefit of adoption to him. The juvenile court stated that when David returned to the caretaker, he did not fuss and there was no indication that he missed F.P. The court observed, "[T]he only evidence before the court is that David enjoys the play time with [F.P.] and sees it as fun." This was insufficient to overcome adoption as the default option, particularly when David had spent most of his life with the foster parents.

F.P., G.M., and David timely appealed.

---

social worker's ability to objectively carry out his or her duties"].) F.P. alleged the social worker and David's foster mother "berated" her and accused her of bullying during a visit with David on December 20, 2024. F.P. argued the social worker mischaracterized the encounter in her report, and F.P. submitted a recording of the interaction. The court denied the motion, stating, among other things, that there was a failure of proof because the purported evidence of bias submitted by mother was an illegally-obtained recording in Spanish and the translation was not certified. Appellants do not challenge this ruling on appeal.

12

## DISCUSSION

The sole issue on appeal is whether the trial court abused its discretion when it denied the parties' request for a bonding study. We conclude the court acted within its discretion.

A.      *Governing Law and Standard of Review*

A parent may avoid termination of parental rights by proving, among other statutory exceptions, that the parental-benefit exception applies. (See *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be *detrimental* to the child." (*Id.* at p. 629.) "[I]n assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.)

Because the court faces a "complex task" when determining whether the parental-benefit exception applies, "courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C., supra*, 11 Cal.5th at pp. 633, fn. 4, 634; accord, *In re P.S.* (2024) 107 Cal.App.5th 541, 555.) A party may request a bonding study to be conducted at any time before or during the trial of an action pursuant to Evidence Code section 730.[5]

---

[5]      Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the

"To be clear, parents are not automatically entitled to the appointment of a bonding expert under Evidence Code section 730; a sufficient need for one must be shown." (*In re P.S.*, *supra,* 107 Cal.App.5th at p. 559; accord, *In re M.V.* (2023) 87 Cal.App.5th 1155, 1179 ["'[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent' to terminating parental rights"].) Thus, "the denial of a belated request for [a bonding] study is fully consistent with the scheme of the dependency statutes, and with due process," as such studies may delay permanency and require a continuance of the section 366.26 permanency planning hearing. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 (*Richard C.*).) "[J]uvenile courts should consider the particular circumstances of the family that will bear on how much time will be needed to obtain a useful and informative study." (*In re P.S.*, at p. 558.)

The court's power to appoint an expert under this statute is discretionary and reviewed for abuse of discretion. (See *In re P.S.*, *supra,* 107 Cal.App.5th at p. 553.) We will not disturb the ruling unless we find the court exceeded the limits of discretion by making an arbitrary, capricious, or patently absurd determination. (See *In re Aaron R.* (2005) 130 Cal.App.4th 697, 705-706.)

---

trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

14

B. *The Juvenile Court's Denial of the Request for a Bonding Study Made at the Section 366.26 Hearing Was Not Arbitrary, Capricious or Patently Absurd*

Here, the court denied the request for a bonding study because it came "too late" in the proceedings and based on its conclusion that a bonding study was unnecessary to help the court in making its permanency findings. The court acted within its discretion when it denied the bonding study.

We are persuaded by the reasoning in *Richard C., supra,* 68 Cal.App.4th at pages 1194 to 1195, which presented substantially similar facts. *Richard C.* held the juvenile court did not abuse its discretion when it denied a mother's request for a bonding study after the court had terminated reunification services and after the agency had prepared a section 366.26 report, as this was "too late in the proceedings to be a necessary part of the court's efforts to develop a permanent plan for the children." (*Id.* at p. 1194.) *Richard C.* explained, when reunification services have been terminated, "'the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability.'" (*Id.* at p. 1195.) *Richard C.* reasoned that allowing bonding studies "after the termination of reunification services would frequently require delays in permanency planning," and that the "Legislature did not contemplate such last-minute efforts to put off permanent placement." (*Id.* at p. 1197.) Although "it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*Ibid.*)

Like the mother in *Richard C.,* F.P. has similarly failed to demonstrate the "compelling circumstances" that would warrant a belated bonding study. F.P. requested a bonding study at the December 19, 2024 hearing, after the juvenile court had terminated reunification services on August 22, 2024, and after the Department had issued its section 366.26 report addressing the *Caden C.* factors as to F.P. The juvenile court was within its discretion to determine the delay required in obtaining a bonding study would adversely impact David's interest in permanency and stability.

Further, as stated, the juvenile court reasonably concluded it had abundant other evidence to make its determination. It heard testimony from F.P., G.M., the Department social worker, and an investigator hired by F.P. Each witness generally testified positively about F.P.'s visits with David, including that she was prepared, interacted appropriately, and engaged with David the entire time. The court also relied upon a record that contained 18 months of visitation logs. The monitors gave detailed, objective, and positive remarks about F.P.'s interactions with David during visits. F.P.'s own investigator testified she was unable to provide information that would differ from what was documented in the visitation logs. There does not appear to be anything in the record that suggests it was difficult for the juvenile court to assess F.P.'s bond with David or that an expert's analysis was necessary under the circumstances presented. It was within the court's discretion to decide that a belated bonding study was not needed for it to interpret the evidence, particularly when weighed against the additional delay that would likely result. (See *Richard C., supra,* 68 Cal.App.4th at p. 1195*; In re Lorenzo C.* (1977) 54 Cal.App.4th 1330, 1341 ["The applicable

16

standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study."].)

We are not persuaded by F.P.'s argument that a bonding study would not have resulted in any delay because the court set further permanency hearings for January and February of 2025, two months after F.P. made her initial request for a bonding study. There is no indication a bonding study would have been successfully completed within that time frame. When F.P. made her request on December 19, 2024, she did not indicate she had a person in mind for the bonding study, much less that that person's schedule would accommodate an expedited study. F.P.'s own investigator viewed only one visit during that two-month period. The juvenile court stated an expert would need to observe more than one visit to complete a bonding study.

Nor are we persuaded by F.P.'s argument that the Department presented a biased report of her visits with David, necessitating an independent third party review. The juvenile court rejected this argument at the contested section 366.26 hearing and in denying F.P.'s motion to disqualify the social worker. The juvenile court was entitled to credit the social worker's testimony and determine she was credible. (See *In re Cole C.* (2009) 174 Cal.App.4th 900, 918; *In re Brequia Y.* (1997) 57 Cal.App.4th 1060, 1068.) The social worker testified she was required to and did present an impartial report. Moreover, the Department's reports included observations from multiple monitors, and F.P. does not contend that all the monitors were biased. Nor does F.P. dispute the monitors' factual reports of her visits with David, which included the date of occurrence, that

17

F.P. fed and played with David, and that David transitioned easily when the visit was over.

We also reject F.P.'s argument that "[w]ithout the assessment of a qualified professional, improper factors and expectations were relied on, and the juvenile court was 'reduced to arbitrary decisions based upon [an] emotional response.'" The purported improper factors cited by F.P. are those relied upon by the Department, rather than the juvenile court. F.P. has not demonstrated the court acted arbitrarily based on an emotional response. Indeed, the juvenile court explained its reasons for the permanency ruling. After reviewing the evidence before it and the arguments of the parties, the court concluded that although the record shows David enjoys playing with F.P. and "sees it as fun," terminating their relationship would not be detrimental to David because David does not appear to miss F.P. when their visits were skipped and he did not appear to be troubled when the visits ended. The court reached this conclusion based on the extensive evidence detailed in the Department's reports, and by observing their interaction during the hearings. As such, F.P. does not show the juvenile court's determination was arbitrary or an emotional response, much less that a bonding study was necessary to avoid an erroneous result. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 [affirming the juvenile court's conclusion that the parental-benefit exception did not apply where "there was no hint in the record before the juvenile court that Angel would be harmed in any way if her relatively brief, albeit happy, visits with Mother were to end"].) In all events, F.P.'s sole contention on appeal is that the juvenile court abused its discretion when it rejected the requests for a bonding study. By failing to address the *Caden C.* elements, F.P. has forfeited a

18

challenge to the court's permanency ruling on the ground the court relied on improper factors.  (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79 [an appellant's failure to support an issue with reasoned argument and citations forfeits the issue].)

## DISPOSITION

The court's order terminating parental rights is affirmed.


MARTINEZ, P. J.

We concur:


SEGAL, J.                                    FEUER, J.